In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1349

WELLNESS INTERNATIONAL NETWORK,
LIMITED, RALPH OATS AND CATHY
OATS,

*Plaintiffs-Appellees,*

*v.*

RICHARD SHARIF,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cv-05303 — **Harry D. Leinenweber**, *Judge.*

ARGUED SEPTEMBER 18, 2012 — DECIDED AUGUST 21, 2013

Before FLAUM, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This appeal is the most recent chapter
in a decade-long saga spanning two circuits involving the
debtor, Richard Sharif, and his judgment creditors, Wellness
International Network, Ltd., Ralph Oats, and Cathy Oats

(collectively, "WIN"). After being slapped with a judgment in excess of $650,000 in the Northern District of Texas as a sanction for his failure to engage in discovery, Sharif filed for Chapter 7 bankruptcy in the Northern District of Illinois. WIN filed a five-count adversary complaint in the bankruptcy court. Counts I through IV sought to prevent discharge of Sharif's debts under 11 U.S.C. § 727, and Count V sought a declaratory judgment that a trust of which Sharif was trustee was in fact Sharif's alter ego. Sharif continued his evasive and dilatory tactics, failing to respond to WIN's and the bankruptcy trustee's discovery requests. The bankruptcy court ordered Sharif to comply with the discovery requests and warned him that failure to do so would result in a default judgment. Sharif tendered some discovery but his responses fell far short of full compliance. After a hearing, the bankruptcy judge issued an opinion and order entering default judgment in WIN's favor and subsequently awarded attorney's fees to WIN. Sharif appealed to the district court. *See* 28 U.S.C. § 158(a)(1).

After the bankruptcy judge's entry of judgment but before briefing on the appeal in the district court, the Supreme Court decided *Stern v. Marshall*, 131 S. Ct. 2594 (2011), in which it held that a bankruptcy court lacked constitutional authority to enter final judgment on a debtor's state-law counterclaim against a creditor, even though Congress had granted the bankruptcy court statutory authority to do so. A few months after *Stern* was decided, Sharif filed his opening brief in the district court, but he did not challenge the bankruptcy judge's authority to enter final judgment on the adversary complaint. In December 2011, Sharif's sister filed a motion in the district court to withdraw the reference on the basis of *Stern*. Later that

month, our court decided *Ortiz v. Aurora Health Care, Inc.* (*In re Ortiz*), 665 F.3d 906 (7th Cir. 2011), in which we dismissed a direct appeal from a bankruptcy court on the ground that there was no final judgment because the bankruptcy judge had lacked constitutional authority to enter one under *Stern*. Shortly thereafter, Sharif filed a motion for supplemental briefing in the district court so that he could advance a *Stern* argument. The district judge denied both motions as untimely, holding that a *Stern* objection to a bankruptcy judge's authority to enter final judgment is waivable and that Sharif's failure to raise it earlier constituted waiver, and affirmed the bankruptcy court's entry of default judgment. Sharif's sister did not appeal the denial of her motion to withdraw the reference, but Sharif appealed the balance of the district court's decision to this court.

We hold that a constitutional objection based on *Stern* is not waivable because it implicates separation-of-powers principles. We also hold that the bankruptcy judge lacked constitutional authority to enter a final judgment on the alter-ego claim. In contrast, we hold that the bankruptcy judge had constitutional authority to enter final judgment on the first four counts of the adversary complaint, each of which were objections to the discharge of Sharif's debts. Finally, we hold that the entry of default judgment and awarding of fees were proper sanctions under the circumstances, though we remand for a recalculation of fees.

## I. Background

### A. Texas Litigation

The parties' relationship began when Sharif entered into distributorship contracts with WIN for the sale of health and wellness products. In January 2003, Sharif and others sued WIN in the Northern District of Illinois claiming that WIN was running a pyramid scheme. *Sharif v. Wellness Int'l Network, Ltd.,* 376 F.3d 720, 722 (7th Cir. 2004). In 2004, our court reversed the district court's denial of WIN's motion to compel arbitration on some of the claims. *Id.* at 726–27. On remand, the district court dismissed without prejudice the claims that were not subject to arbitration pursuant to forum-selection clauses in the contracts requiring suit to be filed in the Northern District of Texas, and this court affirmed. *Muzumdar v. Wellness Int'l Network, Ltd.,* 438 F.3d 759 (7th Cir. 2006).

Sharif and his co-plaintiffs refiled their suit in the Northern District of Texas. *See In re Sharif,* 447 B.R. 853, 854 (Bankr. N.D. Ill. 2011). They ignored WIN's discovery requests, resulting in the material facts being deemed admitted against them. The district court subsequently granted summary judgment for WIN, and the Fifth Circuit affirmed, observing as follows:

> A review of the record on appeal demonstrates that Appellants' untimely performance in this court mirrors a lengthy history in the district court of dilatoriness and hollow posturing interspersed with periods of non-performance or insubstantial performance and compliance by Appellants and their counsel, leaving the unmis-

takable impression that they have no purpose other than to prolong this contumacious litigation for purposes of harassment or delay, or both. The time is long overdue to terminate Appellants' feckless litigation at the obvious cost of time and money to the Defendants by affirming all rulings of the district court but remanding the case to that court for the reinstatement of its consideration of Appellees' motion for attorney's fees. In so doing, we caution Appellants that any further efforts to prolong or continue proceedings in this court, including the filing of petitions for rehearing, will potentially expose them to the full panoply of penalties, sanctions, damages, and double costs pursuant to FRAP 38 at our disposal.

*Sharif v. Wellness Int'l Network, Ltd.*, 273 F. App'x 316, 317 (5th Cir.), *cert. denied*, 555 U.S. 1085 (2008). On remand, the district court awarded $655,596.13 in attorney's fees to WIN as a sanction against Sharif and his co-plaintiffs. No. 3:05–CV–01367–B, 2008 WL 2885186 (N.D. Tex. July 22, 2008).

Thereafter, WIN served Sharif with post-judgment discovery requests to discover Sharif's assets, but Sharif ignored them. In November 2008, the Texas district court granted WIN's motion to compel discovery and ordered Sharif to respond to WIN's outstanding discovery requests; Sharif ignored the court's order and failed to appear for his deposition. WIN followed-up with a motion for civil contempt. In February 2009, Sharif was arrested and held in civil contempt

for discovery violations, but the Texas district court released him on his own recognizance after he promised to respond to the post-judgment discovery requests and to reimburse WIN for fees and other costs associated with the motion to compel and the motion for civil contempt. *See* 447 B.R. at 855; *Wellness Int'l Network v. J.P. Morgan Chase Bank, N.A.*, 407 B.R. 316, 318 (Bankr. N.D. Ill. 2009). Sharif again ignored the district court's orders.

### B.  Sharif Files for Bankruptcy

Two weeks later, on February 24, 2009, Sharif filed for bankruptcy under Chapter 7 in the Northern District of Illinois. The bankruptcy petition listed WIN as a creditor, along with various members of Sharif's family to whom he allegedly owed $271,000 in undocumented loans. WIN was the only creditor to file a proof of claim.

At some point, WIN obtained a June 14, 2002, loan application that Sharif had submitted to the now-defunct Washington Mutual on which he claimed to have owned the following assets: (1) three businesses worth $2,400,000; (2) three parcels of real property worth $1,400,000; (3) a retirement account worth $1,400,000; and (4) three bank accounts containing $180,000 in cash ("Loan Assets"). Thus, in 2002 Sharif had represented to a financial institution that he had assets worth $5,380,000, and Washington Mutual had approved a loan based on those representations. WIN had requested documents related to these assets during the Texas litigation, but Sharif had never tendered them.

On March 25, 2009, the bankruptcy trustee, Horace Fox, Jr., held the initial creditors' meeting, *see* 11 U.S.C. § 341, and at

this meeting both WIN and Fox requested that Sharif provide documents related to the Loan Assets; Fox continued the meeting until April so that Sharif could gather the documents. On April 21, the § 341 creditors' meeting resumed but Sharif failed to provide the requested documentation. Instead, Sharif informed WIN and Fox that he had lied on the loan application and that he never had owned the Loan Assets; rather, those assets were owned by the Soad Wattar Trust, of which Sharif was trustee. WIN then requested that Sharif produce documentation evidencing the formation and funding of the Soad Wattar Trust. Fox again continued the § 341 meeting so that Sharif could gather the requested documents, but Sharif never produced any of them.

### C. Adversary Proceeding

WIN subsequently initiated an adversary proceeding in the bankruptcy court. The amended complaint asserted five counts: Count I alleged that Sharif had "continuously concealed property that he owns by holding such property in the name of the Soad Wattar Living Trust with improper intent to deceive" in violation of 11 U.S.C. § 727(a)(2)(A). Count II alleged that Sharif had "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information" in violation of § 727(a)(3). Count III alleged that Sharif had knowingly and fraudulently made a false oath or account with regard to his bankruptcy case in violation of § 727(a)(4)(A). Count IV alleged that Sharif had failed to explain the disappearance of the more than $5 million of Loan Assets in violation of § 727(a)(5). And Count V sought a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that the Soad Wattar Trust is Sharif's alter ego and that its

assets should therefore be treated as part of Sharif's bank-
ruptcy estate.

On February 10, 2010, WIN served requests for production
and interrogatories on Sharif in both his individual capacity
and in his capacity as trustee for the Soad Wattar Trust; all
responses were due on March 15. On March 12, Sharif re-
quested an indefinite extension of time to respond to all
discovery requests; his counsel indicated that Sharif had gone
to Syria to tend to his terminally ill mother. On March 24,
Sharif failed to appear for his deposition and through counsel
filed a motion for an extension of time, which the bankruptcy
court subsequently denied. WIN's counsel and Sharif's counsel
conferred on April 13 to resolve the unfulfilled discovery
requests. WIN requested that Sharif provide complete re-
sponses to the outstanding discovery requests by April 23 and
provide potential dates for his deposition. Sharif's counsel did
not agree to these requests because he did not know if or when
Sharif would return to the United States.

On April 15, WIN filed a motion for sanctions and, in the
alternative, a motion to compel discovery. On April 21, the
bankruptcy court granted WIN's motion to compel discovery,
ordering "[t]hat Richard Sharif, individually and as Trustee has
to April 28, 2010 to comply with all of [WIN's] outstanding
discovery requests, including document production, interroga-
tories, and [Rule] 2004 examination, and *it is further ordered that
in the event Richard Sharif fails to comply by April 28, 2010, an
order of default will be entered against him in the proceeding*, and
the [Motion for Sanctions] is continued for proof of compliance
to April 28, 2010." (Emphasis added.) The bankruptcy court's
order effectively gave Sharif a six-week extension from the

date his discovery responses were initially due. On April 27, Sharif produced approximately 1,500 pages of documents; the court rescheduled the hearing on the motion for May 24 to allow WIN time to review whether the tendered discovery fulfilled the discovery requests.

WIN finally deposed Sharif on May 13. Sharif admitted that he had not provided any documentation concerning the creation and funding of the Soad Wattar Trust. Nor had he provided source data and documents used to complete his tax returns or his signed tax returns. He also admitted that he had not provided information about multiple bank accounts. On May 20, more than three weeks after the court-ordered deadline, Sharif's counsel produced additional documents. The bankruptcy court held a hearing on May 24 and took the matter under advisement. Almost a month later, on June 22, Sharif filed a motion for summary judgment.

On July 6, the bankruptcy court issued its opinion and order entering default judgment for WIN on all five counts of the adversary complaint. The bankruptcy judge found that Sharif had violated the discovery order as follows:

- Sharif and his attorney had signed the interrogatory responses as trustee of the Soad Wattar Trust but the responses lacked a statement of verification as required by Federal Rule of Civil Procedure 33(b) (made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7033), *see, e.g.*, *Hindmon v. Nat'l Ben Franklin Life Ins. Corp.*, 677 F.2d 617, 619 (7th Cir. 1982).

- Sharif had not signed the interrogatory responses directed toward him in his individual capacity; only his attorney had signed them.

- Sharif had ignored the bankruptcy court's October 20, 2009, order requiring that he turn over documents related to the Loan Assets to Fox.

- Sharif had failed to turn over documents related to the Loan Assets in response to WIN's requests for production.

- Sharif had failed to produce any documents related to any trust in which he had an interest, despite the fact that in his sworn bankruptcy petition he had claimed to control property of the Richard Sharif Revocable Trust.

- Sharif had failed to produce bank statements and account records relating to himself and the Soad Wattar Trust and instead provided only names and addresses of three financial institutions with corresponding account numbers.

- Sharif had failed to produce documents relating to his personal bank accounts and instead stated that the documents were available at JP Morgan Chase Bank.

- Sharif had failed to disclose AG Edwards accounts in his bankruptcy petition, and he had failed to produce documents concerning those accounts.

    o He had failed to produce documents concerning approximately $752,050 in assets held by

AG Edwards in joint tenancy for Sharif and his mother, Soad Wattar, and he had failed to produce any documents to support his deposition testimony that those assets had been transferred to Wachovia.

- o He had failed to produce documents related to a variable annuity worth $39,248 held at AG Edwards for his and his sister's benefit as joint tenants.

- Sharif had failed to disclose information related to numerous other accounts that he had admitted having an interest in during his deposition.

- Sharif had failed to disclose why he no longer held a 10% ownership interest in Logan Square MRI & Diagnostic Center, Inc., that he had once claimed.

- Sharif had failed to disclose why he no longer held 100% ownership interest in Sharif Pharmacy, though he had claimed such an interest on his 2002 federal tax return—he said the tax return was incorrect and that he owns only a 10% interest in the pharmacy, but he provided no documentation of that interest.

- Sharif had failed to produce corporate records of Sharif Pharmacy and Hermosa Medical Center after 2006.

- Sharif had failed to produce documents evidencing the formation and funding of the Soad Wattar Trust.

  - o He claimed that the trust had been funded with a $2 million inheritance that had been

transferred by international wire from Beirut, Lebanon, through Dubai, United Arab Emirates, but he did not produce any documents related to such a transfer.

o He had failed to produce documents showing transfers of assets to the Soad Wattar Trust, with the exception of one house.

o He had produced amendments to the Soad Wattar Trust but he had not produced the original trust instrument.

- Sharif had failed to produce his signed federal and state tax returns.

- Sharif had failed to produce the source documents used to prepare his tax returns.

- Sharif had failed to produce documents related to the $271,000 that he allegedly owed his family members.

The bankruptcy court rejected Sharif's contention that, while there were deficiencies, he had made a good-faith effort to comply with all discovery requests. It also noted that Sharif's "supplemental production" on May 20 had occurred several weeks after the court-imposed April 28 deadline and after the May 13 deposition. In response to Sharif's argument that WIN had not consulted with his attorney *after* the discovery had been tendered, the bankruptcy court noted "that a phone call would have been futile because [Sharif] was so grossly out of compliance with his discovery obligations." The court concluded that Sharif had "failed to comply with most of [WIN's]

discovery requests" and that his "lack of compliance is a pattern that has continued from the time of the underlying litigation in Texas to the instant bankruptcy case and adversary proceeding." Accordingly, the bankruptcy judge entered a default judgment in WIN's favor on all five counts of the adversary complaint and ordered Sharif to pay WIN's attorney's fees.

Judgment was entered in both the bankruptcy proceeding and the adversary proceeding. Subsequently, on August 9, the bankruptcy court issued an order awarding WIN $54,405.99 in attorney's fees and $8,349.75 in other costs in connection with the motion for sanctions. And on November 18, the court awarded WIN additional fees and other costs it had incurred in connection with the § 341 creditors' meetings. Sharif timely appealed all four judgments to the district court.

### D.  Appeal to the District Court

On August 9, 2011, Sharif filed his opening appellate brief in the district court, asserting only two claims of error. First, he argued that his right to due process under the Fifth Amendment had been violated because WIN had not conferred with his counsel after the discovery responses were tendered, so he was never given notice of the particular deficiencies prior to the hearing on the motion for sanctions. Second, he argued that the bankruptcy court had abused its discretion in entering a default judgment because he had been a trustee of the Soad Wattar Trust, not a beneficiary.

On December 12, 2011, Ragda Sharifeh, Sharif's sister, filed a motion to withdraw the reference in the district court.[1] She argued that the bankruptcy court had lacked jurisdiction to enter a final judgment on WIN's adversary complaint under *Stern v. Marshall*, 131 S. Ct. 2594 (2011). On January 12, 2012, Sharif filed a motion for supplemental briefing on *Stern* and this court's then-two-week-old decision in *In re Ortiz*, 665 F.3d 906 (7th Cir. 2011).

The district court denied both Ragda's motion to withdraw the reference and Sharif's motion for supplemental briefing as untimely and affirmed the bankruptcy court's judgment. *Sharifeh v. Fox*, Nos. 11 C 8811, 09 BK 05868, 09–AP–00770, 10–AP–02239, 10 C 5303, 10 C 5333, 10 C 6057 & 11 C 175, 2012 WL 469980 (N.D. Ill. Feb. 10, 2012). With regard to the *Stern* issue, the court assumed that Ragda had standing to raise the issue but concluded that objections based on the bankruptcy court's authority to enter a final judgment are waivable because they do not implicate subject-matter jurisdiction and that, by failing to raise the issue sooner, Ragda had voluntarily waived the issue. *Id.* at *5–7. It similarly denied Sharif's motion for supplemental briefing because, although *Ortiz* had only recently been decided, *Stern* had been decided a month and a half before Sharif submitted his opening brief, yet Sharif had

---

[1]    This was not Ragda's first attempt to undo the bankruptcy court's judgment. *See* 457 B.R. 702, 720–32 (Bankr. N.D. Ill. 2011); 447 B.R. 853, 865–68 (Bankr. N.D. Ill. 2011); 446 B.R. 870, 883–85 (Bankr. N.D. Ill. 2011). Indeed, Ragda initiated her own adversary proceeding against Sharif and Fox (though she asserted claims only against Fox), which the bankruptcy court dismissed. 457 B.R. at 720–32. Her appeal of that dismissal is currently pending before a different district judge.

not raised the issue then. *Id.* at *10. On the merits, the court applied a deferential standard of appellate review, considering whether the bankruptcy court's entry of sanctions constituted an abuse of discretion and whether its factual findings were clearly erroneous. *Id.* at *7. It first rejected Sharif's due-process argument, concluding that Sharif had received notice and an opportunity to be heard and that the bankruptcy court had expressly warned Sharif in its April 21 order that failure to comply with the discovery requests would result in a default judgment. *Id.* at *8–9. The court then concluded that the bankruptcy judge had not abused her discretion in finding that Sharif had failed to comply with the order compelling discovery and that he had acted willfully and in bad faith. *Id.* at *9. The district court therefore affirmed the four judgments of the bankruptcy court in their entirety, *id.* at *10, and Sharif now appeals (though Ragda does not).

Between his opening and reply briefs, Sharif raises several issues in this court. Specifically, he contends that the bankruptcy court lacked jurisdiction to enter a final judgment under *Stern*; that the bankruptcy court abused its discretion in awarding default judgment as a discovery sanction; that the bankruptcy court erred in awarding fees and costs to WIN; that the judgment on Count V is void because Illinois law required WIN to join the Soad Wattar Trust's beneficiaries; and that the alter-ego claim should have been brought by Fox, not WIN. The purple elephant in this case is whether the bankruptcy court had authority to enter a final judgment and, if not, whether that is an issue that may be waived. We begin there.

## II. The Bankruptcy Court's Authority

Sharif argues that the bankruptcy court lacked constitu-
tional authority to enter final judgment, default or otherwise,
on WIN's adversary complaint under the holdings of *Stern v.
Marshall*, 131 S. Ct. 2594 (2011), and *In re Ortiz*, 665 F.3d 906
(7th Cir. 2011). WIN responds that Sharif waived this argument
by failing to present it sooner and, through his litigation
conduct, consented to final adjudication by the bankruptcy
judge. Sharif replies that this issue is not waivable and may be
raised at any time.

As we discuss later, whether Sharif's objection to the
bankruptcy court's constitutional authority is waivable is a
thorny question. The only two circuits to have addressed the
issue head-on since *Stern* was decided issued their respective
decisions after we heard oral argument in this appeal and came
to opposite conclusions. *In re Bellingham Ins. Agency, Inc.*, 702
F.3d 553, 566–70 (9th Cir. 2012) (waivable), *cert. granted*, 133 S.
Ct. 2880 (2013) (No. 12–1200); *Waldman v. Stone*, 698 F.3d 910,
917–18 (6th Cir. 2012) (not waivable), *cert. denied*, 133 S. Ct. 1604
(2013). On June 24, 2013, the Supreme Court granted a petition
for a writ of certiorari in the case from the Ninth Circuit, which
raised the issue of whether a *Stern* objection is waivable. *Exec.
Benefits Ins. Agency v. Arkison*, 133 S. Ct. 2880 (2013) (No.
12–1200). A final answer to that question is likely to be ren-
dered when the Supreme Court decides that case next term.
But we think the path to resolution of that issue is sufficiently
clear that we should address it now rather than further
extending the litigation between Sharif and WIN by waiting for
the conclusion of the *Executive Benefits* case. We therefore
proceed to consider Sharif's appeal, but before addressing the

constitutional issues, we must determine whether the bankruptcy court had statutory authority to enter final judgment on WIN's claims. *In re Ortiz*, 665 F.3d at 911; *see Stern*, 131 S. Ct. at 2604–08.

### A. Statutory Authority

District courts have "original and exclusive jurisdiction of all cases under title 11," and they have original jurisdiction "of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a)–(b). Bankruptcy courts are units of the district courts, 28 U.S.C. § 151, and the bankruptcy judges "serve as judicial officers of the United States district courts established under Article III of the Constitution," § 152(a)(1). The district courts may refer "any or all" bankruptcy cases and proceedings to their respective district's bankruptcy judges, § 157(a), which is how the bankruptcy judge came to preside over Sharif's bankruptcy proceedings and WIN's adversary complaint, *see* N.D. Ill. Local R. 40.3.1(a).

Congress has granted bankruptcy judges the authority to hear, determine, and enter final orders and judgments in "all cases under title 11 and all core proceedings," subject to traditional appellate review in the district court. §§ 157(b)(1) & 158. Proceedings "that arise in a bankruptcy case or under Title 11" are "core proceedings." *Stern*, 131 S. Ct. at 2605; *see also* § 157(b)(2) (providing nonexhaustive list of sixteen types of core proceedings). Proceedings that do not arise in a bankruptcy case or under title 11 but are otherwise related to a case under title 11 are noncore proceedings. *See Stern*, 131 S. Ct. at 2604–05. A bankruptcy judge may hear noncore proceedings

but, absent consent of the parties, *see* § 157(c)(2), may only "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected," § 157(c)(1).

The first four counts of WIN's adversary complaint clearly are core matters, and Sharif does not argue otherwise. In those counts, WIN objected to the discharge of Sharif's debts under 11 U.S.C. § 727(a). Congress has explicitly identified "objections to discharges" as core proceedings. 28 U.S.C. § 157(b)(2)(J). The bankruptcy court therefore had statutory authority to enter final judgment on WIN's first four claims.

Sharif asserts that the fifth count, the alter-ego claim, is a noncore matter, which would mean that the bankruptcy court lacked statutory authority to enter final judgment unless the parties consented. Unlike objections to discharge, alter-ego claims are not expressly listed as core proceedings in § 157(b)(2), but that list is not exhaustive and the fact that it is a state-law claim is not dispositive, *see* § 157(b)(3) ("A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."). Courts have reached differing conclusions as to whether alter-ego claims are core matters. *Compare Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 192 (2d Cir. 2003) (core), *with Mirant Corp. v. Southern Co.*, 337 B.R. 107, 117 (N.D. Tex. 2006) (noncore). But we need not determine whether the alter-ego claim is core or noncore because Sharif has waived the issue. Unlike the murky issue of waiver surrounding the

bankruptcy court's constitutional authority, it is clear that a party can waive an argument concerning the core/noncore status of a claim under § 157. *See Stern*, 131 S. Ct. at 2606–08; *Waldman*, 698 F.3d at 917–18. Sharif never argued in either the bankruptcy court or the district court that the alter-ego claim was a noncore matter. *See, e.g.*, *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district court are waived on appeal." (citations omitted)). Furthermore, in this court, he merely asserts in his jurisdictional statement that the alter-ego claim was not a core matter, without any supporting argument or authority. *See, e.g.*, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim." (citation omitted)). So we proceed on the assumption that the alter-ego claim was a core proceeding over which the bankruptcy court had authority under § 157(b)(1) to enter final judgment, but the existence of statutory authority will not justify the bankruptcy court's actions if the court lacked constitutional authority, *cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174–79 (1803).

### B.  Constitutional Authority

Article III, § 1, vests the "judicial Power of the United States" in a judiciary with judges who enjoy life tenure (subject to removal only by impeachment) and whose salaries may not be diminished. *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 16 (1955). "Article III is 'an inseparable element of the constitutional system of checks and balances' that 'both defines the power and protects the independence of the Judicial Branch.'" *Stern*, 131 S. Ct. at 2608 (quoting *N. Pipeline Constr. Co. v.*

*Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) (plurality opinion)). It "could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Id.* at 2609. Therefore, as a general rule, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855). So suits that are made of "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," *N. Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring in judgment), must be decided by Article III judges when brought within the bounds of federal jurisdiction. *Stern*, 131 S. Ct. at 2609.

Bankruptcy judges are not Article III judges. They are appointed to 14-year terms "by the court of appeals of the United States for the circuit in which [their] district is located," 28 U.S.C. § 152(a), and a bankruptcy judge may be removed "for incompetence, misconduct, neglect of duty, or physical or mental disability" by a majority vote of "the judicial council of the circuit in which the judge's official duty station is located," § 152(e). And although by statute their salaries are equivalent to "92 percent of the salary of a judge of the district court of the United States," § 153(a), since they are not Article III judges their salaries may be diminished by Congress, *cf. N. Pipeline*, 458 U.S. at 53 (plurality opinion).

*Stern v. Marshall* held that a bankruptcy court lacked authority under Article III, § 1, to enter final judgment on a

bankruptcy petitioner's state-law counterclaim for tortious interference that was not resolved in the process of ruling on a creditor's proof of claim. 131 S. Ct. at 2620. But *Stern* was not the Supreme Court's first foray into the Article III thicket surrounding bankruptcy judges and, as explained shortly, the Court's decision in *Stern* was heavily influenced by its two previous decisions concerning Article III limitations in the bankruptcy context.

In *Northern Pipeline*, the Court held that a bankruptcy court lacked constitutional authority to enter final judgment on a debtor's state-law contract claim against a noncreditor, but no rationale commanded a majority of the Justices. 458 U.S. at 63–87 (plurality opinion); *id.* at 90–92 (Rehnquist, J., concurring in judgment). A majority, however, agreed on two basic principles, namely, that adjudication of the contract claim at issue did not implicate the so-called "public rights" doctrine, *id.* at 67–76 (plurality opinion); *id.* at 91 (Rehnquist, J., concurring in judgment), and that the bankruptcy courts were not mere adjuncts to the district courts, *id.* at 76–87 (plurality opinion); *id.* at 91 (Rehnquist, J., concurring in judgment). After *Northern Pipeline*, Congress enacted the current statute, the Bankruptcy Act of 1984, in which (among other changes) it created the core/noncore distinction.

A few years later, the Court returned to the Article III issue presented by bankruptcy courts, albeit in a less direct manner. In *Granfinanciera, S.A. v. Nordberg*, a bankruptcy trustee had brought an action to recover an allegedly fraudulent monetary conveyance from third parties that had not submitted claims against the bankruptcy estate, and the third parties had demanded a jury trial under the Seventh Amendment. 492 U.S.

33, 36–37 (1989). The Court explained that "the question whether the Seventh Amendment permits Congress to assign [a cause of action's] adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal." *Id.* at 53. It then concluded that the fraudulent-conveyance actions at issue could be resolved only by Article III courts because they did not involve "public rights" and instead were "quintessentially suits at common law that … resemble[d] state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate." *Id.* at 56. As a result, the Court held that the third parties were constitutionally entitled to a jury trial, notwithstanding the fact that Congress had designated fraudulent-conveyance actions as core proceedings. *Id.* at 36, 49–64.

*Stern v. Marshall* involved a long-running dispute between Vickie Marshall (commonly known as Anna Nicole Smith) and Pierce Marshall concerning the sizeable will of J. Howard Marshall (Vickie's husband and Pierce's father). Before J. Howard died and left Vickie nothing in his will, she filed suit in Texas probate court claiming that Pierce had fraudulently induced J. Howard to sign a living trust that excluded her and that J. Howard had intended to give Vickie half his estate. *Id.* at 2601. After J. Howard died, Vickie filed for bankruptcy in the Central District of California. Pierce filed a complaint in the bankruptcy proceeding, asserting that Vickie had defamed him and seeking a declaration that his defamation claim was not dischargeable in the bankruptcy proceedings. He subsequently filed a proof of claim for the defamation action so that he could

recover damages for it from Vickie's bankruptcy estate. *See* 11 U.S.C. §§ 523(a) & 501(a). Vickie responded with a counterclaim for tortious interference with the gift she had expected from J. Howard, the same claim that she had asserted in Texas probate court. 131 S. Ct. at 2601. The bankruptcy court granted summary judgment for Vickie on Pierce's defamation claim and, after a bench trial, entered judgment for Vickie on her counterclaim. In response to Pierce's objection that the bankruptcy court lacked jurisdiction over Vickie's counterclaim, the bankruptcy court concluded that Vickie's counterclaim was a core proceeding under 28 U.S.C. § 157(b)(2)(c) and, therefore, that it had power to enter judgment on the counterclaim under § 157(b)(1). 131 S. Ct. at 2601–02. Meanwhile, the Texas probate court had conducted a jury trial on the merits of the tortious-interference suit and had entered judgment in Pierce's favor. *Id.* at 2602.

Pierce appealed to the district court, which held that Vickie's counterclaim was *not* a "core proceeding" under § 157(b)(2)(C). Accordingly, the district court treated the bankruptcy court's judgment as proposed, not final, and conducted de novo review in accordance with § 157(c)(1). Even though by that time the Texas probate court had already issued its judgment, the district court declined to give that judgment preclusive effect and found in Vickie's favor. 131 S. Ct. at 2602. The Ninth Circuit reversed on a different issue and in turn was reversed by the Supreme Court in *Marshall v. Marshall*, 547 U.S. 293 (2006). On remand, the Ninth Circuit held that Vickie's counterclaim was not a core proceeding, which meant that the Texas probate court's judgment had been first in time and that the district court had erred in failing to give that judgment

preclusive effect. *In re Marshall*, 600 F.3d 1037, 1055–65 (9th Cir. 2010). The Supreme Court again granted certiorari, 131 S. Ct. 63 (2010), but this time it affirmed the Ninth Circuit, albeit on different grounds.

The Court first rejected Pierce's argument (and the Ninth Circuit's holding) that Vickie's counterclaim was not "a core proceeding" under § 157(b)(2)(C), which specifies that core proceedings include "counterclaims by the estate against persons filing claims against the estate." 131 S. Ct. at 2604–05; *see also id.* at 2605 ("Under our reading of the statute, core proceedings are those that arise in a bankruptcy case or under Title 11."). As a result, the Court held that the bankruptcy court had been granted statutory authority to enter judgment on the counterclaim. *Id.* at 2605.

After addressing another statutory argument (which we explore later), the Court turned to the constitutionality of the bankruptcy court's entry of final judgment and concluded that the bankruptcy court had impermissibly exercised the "judicial Power of the United States." *See id.* at 2620 ("The Bankruptcy Court below lacked the constitutional authority to enter final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditors' proof of claim."). The Court reasoned that the state-law counterclaim did not involve "public rights" and did not stem from a federal statutory scheme or involve a particularized area of law. *Id.* at 2614–15; *see also Granfinanciera*, 492 U.S. at 54–56. Rather, it "involve[d] the most prototypical exercise of judicial power: the entry of final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action

neither derives from nor depends upon any agency regulatory regime." *Id.* at 2615.

The Court then rejected Vickie's argument that Pierce's filing of a claim in the bankruptcy proceeding took her counterclaim outside the confines of Article III, explaining that Pierce's defamation claim did not affect "the nature of Vickie's counterclaim for tortious interference as one at common law that simply attempt[ed] to augment the bankruptcy estate." *Id.* at 2616. Vickie based her argument on both *Katchen v. Landy*, in which the Court held that a bankruptcy referee could rule on a trustee's voidable-preference claim against a creditor who had filed a claim because resolution of the preference issue was necessary to resolve the creditor's claim, 382 U.S. 323, 329–36 (1966), and *Langenkamp v. Culp*, in which the Court held that a preferential-transfer claim against a creditor who had filed a claim could be heard in bankruptcy because under those circumstances "the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship," 498 U.S. 42, 44 (1990) (per curiam). But *Katchen* and *Langenkamp* were distinguishable, the Court explained, because unlike in those cases there "was never reason to believe that the process of ruling on Pierce's proof of claim would necessarily result in the resolution of Vickie's counterclaim." *Stern*, 131 S. Ct. at 2617. Another difference was that the preference actions in *Katchen* and *Langenkamp* were rights of recovery created by federal bankruptcy law, whereas Vickie's counterclaim was neither derived from nor dependent upon bankruptcy law but instead was "a state tort action that exist[ed] without regard to any bankruptcy proceeding." *Id.* at 2618. The Court concluded "that Congress may not bypass

Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.*

The Court also rejected Vickie's argument that the bankruptcy courts were merely "adjuncts" of the district courts. *See id.* at 2618–19; *see also N. Pipeline*, 458 U.S. at 84–86 (plurality opinion); *id.* at 91 (Rehnquist, J., concurring in judgment). Bankruptcy courts, the Court explained, "do not 'ma[k]e only specialized, narrowly confined factual determinations regarding a particularized area of law' or engage in 'statutorily channeled factfinding functions.'" 131 S. Ct. at 2618 (brackets in original) (quoting *N. Pipeline*, 458 U.S. at 85 (plurality opinion)). Rather, they "resolve '[a]ll matters of fact and law in whatever domains of the law to which' the parties' counterclaims might lead," *id.* at 2618–19 (brackets in original) (quoting *N. Pipeline*, 458 U.S. at 91 (Rehnquist, J., concurring in judgment)), thereby exercising "the essential attributes of judicial power," *id.* at 2618. And unlike the adjunct agency in *Crowell v. Benson*, which had no independent authority to enforce its orders and instead relied on the district courts' decisions to enforce or set aside the agency's orders, 285 U.S. 22, 44–45, 51–65 (1932), "a bankruptcy court resolving a counterclaim under 28 U.S.C. § 157(b)(2)(C) has the power to enter 'appropriate orders and judgments'—including final judgments—subject to review only if a party chooses to appeal." 131 S. Ct. at 2619 (citing §§ 157(b)(1), 158(a)–(b)). In view of its authority to make the final determination in core proceedings, the Court concluded, "a bankruptcy court can no more be deemed a mere 'adjunct' of the district court than a

district court can be deemed such an 'adjunct' of the court of appeals." *Id.*

*In re Ortiz* applied *Stern* and held that a bankruptcy court lacked constitutional authority to enter final judgment on debtors' claims that were grounded in Wisconsin law. 665 F.3d at 911–14. Aurora Health Care, Inc., had filed proofs of claim in approximately 3,200 bankruptcy cases in the Eastern District of Wisconsin that had listed the debtors' medical treatment information. *Id.* at 908. A group of debtors (actually, two groups) filed a class-action lawsuit against Aurora, alleging that Aurora had willfully violated a Wisconsin statute barring disclosure of patients' healthcare records. The bankruptcy judge dismissed the suit on summary judgment, concluding that the Wisconsin statute required proof of actual damages and that the debtors had failed to marshal evidence of actual damages. *Id.* at 910; *see* 430 B.R. 523, 534–358 (Bankr. E.D. Wis. 2010). A few months before *Stern* was decided, we authorized the parties to bring a direct appeal to this court under 28 U.S.C. § 158(d)(2).

Based on *Stern*, we held that, although the debtors' claims were "core proceedings," the bankruptcy court had lacked constitutional authority to enter final judgment. *In re Ortiz*, 665 F.3d at 911–14. The debtors' disclosure claims, we explained, were "simply ordinary state-law claims," in all material respects identical to the counterclaim in *Stern*: they involved private parties litigating interests defined by state law that were not historically determined by the executive or legislative branches; no governmental parties were involved; the claims did "not flow from a federal statutory scheme," *id.* at 913; and the claims did not involve "a particularized area of the law"

where Congress had established a body with particular expertise to determine certain factual matters in an efficient and inexpensive manner. *Id.* at 914 (quotations omitted) (citing *Stern*, 131 S. Ct. at 2609, 2612–16). Also, just as in *Stern*, the fact that Aurora had filed "proofs of claim in the debtors' bankruptcies did not give the bankruptcy judge authority to adjudicate the debtors' state-law claims." *Id.* While there was some factual overlap between the debtors' claims and Aurora's proofs of claim, the debtors' claims were not necessarily resolvable in the claims-allowance process, nor were they "'integral to the restructuring of the debtor-creditor relationship.'" *Id.* (quoting *Stern*, 131 S. Ct. at 2617). The debtors' claims simply sought "'to augment the bankruptcy estate—the very type of claim that … must be decided by an Article III court.'" *Id.* (quoting *Stern*, 131 S. Ct. at 2616). Therefore, the bankruptcy judge had lacked constitutional authority to enter final judgment on the debtors' claims, *id.*, and because there was no final judgment, we had to dismiss the appeal for lack of appellate jurisdiction, *id.* at 915; *see* 28 U.S.C. § 158(d).

Sharif contends that under *Stern* and *Ortiz* the bankruptcy judge lacked constitutional authority to enter final judgment on WIN's adversary complaint, in particular the alter-ego claim. Under ordinary principles of waiver, however, Sharif's argument is not preserved because he waited too long to assert it. But the parties dispute whether ordinary principles of waiver apply to a *Stern* objection.

### 1. Waiver

WIN asserts, and the district court held, that *Stern* itself indicates that Sharif's Article III objection is waivable and that,

through his litigation conduct and failure to raise the objection sooner, Sharif in fact waived it. *See Sharifeh*, 2012 WL 469980, at *10; *see also id.* at *5–7 (denying Ragda's motion to withdraw the reference on the ground that she had waived her *Stern* objection). Sharif, on the other hand, contends that his *Stern* objection is not waivable and can be raised at any time because it concerns the bankruptcy court's subject-matter jurisdiction. Neither view is persuasive.

In *Stern*, the Court held that Pierce had waived his alternative, nonconstitutional argument that the bankruptcy court had lacked jurisdiction over his defamation claim under 28 U.S.C. § 157(b)(5) ("personal injury tort and wrongful death claims shall be tried in the district court"). 131 S. Ct. at 2606–08. The Court reasoned that neither the text nor the context of § 157(b)(5) had the hallmarks of a jurisdictional statute and explained that "we are not inclined to interpret statutes as creating a jurisdictional bar when they are not framed as such." *Id.* at 2607 (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)). Section 157 in general merely "allocates the authority to enter final judgment between the bankruptcy court and the district court" and "does not implicate questions of subject-matter jurisdiction." *Id.* (citations omitted). And § 157(b)(5) merely "specifies where a particular category of cases should be tried." *Id.* The Court held that these "statutory limitation[s]" were waivable and that, given his "course of conduct" in the bankruptcy court, Pierce had "consented to that court's resolution of his defamation claim (and [had] forfeited any argument to the contrary)." *Id.* at 2607–08.

At first blush, then, *Stern* appears to support WIN's waiver argument. But there is a significant difference between the

waived objection in *Stern* and Sharif's objection, namely, the argument in *Stern* concerned only the bankruptcy court's *statutory* authority, whereas Sharif's argument concerns the bankruptcy court's *constitutional* authority. We discern nothing in *Stern* that supports the proposition that a party may waive an Article III objection to a bankruptcy judge's entry of final judgment. In point of fact, a different portion of the *Stern* opinion casts serious doubt on whether notions of waiver and consent have any role in bankruptcy, given that creditors must go to the bankruptcy court to pursue their claims. *See* 131 S. Ct. at 2614–15 & n.8; *see also Granfinanciera*, 492 U.S. at 59 n.14. For these reasons, we do not think *Stern* supports WIN's position.

As for Sharif's argument, it is true that questions of subject-matter jurisdiction may be raised at any time, as parties cannot consent to subject-matter jurisdiction; indeed, such questions must be considered by a court *sua sponte*. *See, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998); *Capron v. Van Noorden*, 6 U.S. (2 Cranch) 126, 127 (1804). But we disagree with Sharif that his Article III, § 1, objection concerns the bankruptcy court's subject-matter jurisdiction, for several reasons. First, as noted above, *Stern* held that § 157 constitutes a statutory allocation of authority between the bankruptcy courts and the district courts, and Article III, § 1, can be viewed similarly, that is, as an allocation of authority between Article III courts and non-Article III courts. Second, in resolving the constitutional issue in *Stern*, the Court never asserted that the bankruptcy court in that case had lacked subject-matter jurisdiction; rather, it held that "[t]he Bankruptcy Court … lacked the *constitutional authority* to enter a final judgment on a state law counterclaim that is not resolved in the process of

ruling on a creditor's proof of claim," 131 S. Ct. at 2620 (emphasis added). Third, the constitutional bases of federal subject-matter jurisdiction are set forth in Article III, § 2, whereas Sharif's objection to the bankruptcy court's entry of final judgment is based on Article III, § 1. Finally, Sharif's reliance on *Ortiz* for the proposition that a *Stern* objection is jurisdictional is misplaced, as the jurisdictional issue in *Ortiz* concerned whether there was a valid final judgment for purposes of *appellate* jurisdiction, given the unique procedural posture of that appeal (a direct appeal from the bankruptcy court); *Ortiz* did *not* hold that the bankruptcy court had lacked jurisdiction. Consequently, we do not think the waiver issue can be resolved under the well-established principle that questions of subject-matter jurisdiction are not waivable. Nevertheless, we agree with Sharif that under current law his constitutional objection to the bankruptcy court's entry of final judgment is not waivable.

Although consent has no role under Article III, § 2, the Supreme Court has acknowledged a limited role for notions of consent and waiver under Article III, § 1. *See Stern*, 131 S. Ct. at 2613–14; *id.* at 2625–26, 2627–28 (Breyer, J., dissenting); *Peretz v. United States*, 501 U.S. 923, 936–39 (1991); *Granfinanciera*, 492 U.S. at 59 n.14; *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848–57 (1986); *cf. Roell v. Withrow*, 538 U.S. 580 (2003) (holding that under 28 U.S.C. § 636(c)(1) parties may consent to proceedings before a magistrate judge through their litigation conduct).

This appears to stem from the fact that § 1 protects two separate interests—it safeguards litigants' right to have their cases decided by independent and impartial judges, and it also

operates as an inseparable element of separation of powers by protecting the judicial branch from encroachment by the political branches. *Stern*, 131 S. Ct. at 2608–09; *Schor*, 478 U.S. at 848–50; *N. Pipeline*, 458 U.S. at 58 (plurality opinion). The guarantee of an independent and impartial judiciary serves primarily to protect personal interests, and so it "is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried." *Schor*, 478 U.S. at 848–49 (citations omitted). The role that § 1 plays in our system of checks and balances, however, protects the larger structural interests of our constitutional government, and "[t]o the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2." *Id.* at 850–51 (citation omitted). "When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect." *Id.* at 851; *see also Freytag v. C.I.R.*, 501 U.S. 868, 896–98 (1991) (Scalia, J., concurring in judgment). *But cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 231 (1995) (rejecting proposition "that legal defenses based upon doctrines central to the courts' structural independence can never be waived"); *Freytag*, 501 U.S. at 893–901 (same).

The dual nature of Article III, § 1, renders notions of waiver and consent more nuanced than they are in other areas. The practical problem, of course, is the difficulty of separating out the waivable personal safeguard from the nonwaivable

structural safeguard, for in every case an argument that a party waived the personal protection can be met with the argument that the court must still consider the objection because the structural aspect cannot be waived. The net result would be that an Article III, § 1, argument can never be waived and that parties can never consent to adjudication by a non-Article III tribunal, which would render *Schor*'s discussion of the waivability of the personal protections meaningless. But a close examination of *Schor* demonstrates how this difficulty is to be resolved.

*Schor* involved an Article III challenge to an agency's authority to decide a state-law counterclaim. A customer brought a claim for reparations against his commodity futures broker before the Commodity Futures Trading Commission (CFTC), and the broker filed a state-law counterclaim for the same amount. After the CFTC ruled in favor of the broker on both the claim and the counterclaim, the customer appealed on the ground that the CFTC's adjudication of the counterclaim ran afoul of Article III, § 1. The Court held that the CFTC's assumption of jurisdiction over the state-law counterclaim was not unconstitutional. Although the customer had consented to proceed before the CFTC rather than an Article III court, *id.* at 849–50, the Court explained that consent could not be dispositive due to the structural interests protected by Article III, § 1, *id.* at 851. The Court then examined several factors and held that "the congressional scheme [did] not impermissibly intrude on the province of the judiciary." *Id.* at 851–52. While the counterclaim at issue was a private right (rather than a public right) traditionally decided by courts, the Court found it significant that the CFTC dealt only with a "'particularized

area of law,'" *id.* at 852 (quoting *N. Pipeline*, 458 U.S. at 85
(plurality opinion)); the CFTC's adjudicatory powers departed
from the traditional agency model in only one respect, its
jurisdiction over state-law counterclaims, *id.*; like in *Crowell*,
285 U.S. 22, the CFTC's orders were enforceable only by a
district court, its factual findings were reviewed under a
"weight of the evidence" standard, and its legal conclusions
were reviewed de novo, *Schor*, 478 U.S. at 853; and the CFTC's
counterclaim jurisdiction was "limited to that which [was]
necessary to make the reparations procedure workable," *id.* at
856. Therefore, the Court concluded, "the magnitude of any
intrusion on the Judicial Branch [could] only be termed *de
minimis.*" *Id.*; *see also Peretz*, 501 U.S. at 936–37 (holding that a
criminal defendant in a felony trial may consent to jury
selection presided over by a magistrate judge: no structural
issues were implicated because magistrates were appointed
and subject to removal by Article III judges; the district court
made the ultimate decision to invoke the magistrate's assis-
tance, subject to veto by the parties; and the decision whether
to empanel the jury whose selection was overseen by the
magistrate remained entirely with the trial judge).

   As noted earlier, since we heard oral argument, two of our
sister circuits have addressed the waiver issue head-on and
have come to divergent conclusions; both circuits relied on
*Schor*. In *Waldman v. Stone*, the Sixth Circuit held that a *Stern*
objection to the bankruptcy court's constitutional authority is
not waivable. 698 F.3d at 917–18. Stone filed for bankruptcy
and initiated an adversary proceeding against Waldman,
seeking both discharge of his debts to Waldman and affirma-
tive relief (e.g., fraud, specific performance). After a bench trial,

the bankruptcy court discharged Stone's obligations and awarded him a little over $3 million on his affirmative claims. *Id.* at 915–16. On appeal, the court held that Waldman could and had in fact waived any objection to the bankruptcy court's *statutory* authority, but it held that Waldman could not waive the *constitutional* objection. *Id.* at 917–18. The court rejected the argument that, in bankruptcy cases like Stone's, the "personal right" character predominates. *Id.* While acknowledging that the case did not pose a great risk of aggrandizement of the legislative and executive branches, the court explained that this took "too narrow a view of the interests preserved by Article III," which is also concerned with diminution of the judicial branch. *Id.* at 918; *see also id.* ("To the extent that Congress can shift the judicial Power to judges without [the tenure and salary] protections, the Judicial Branch is weaker and less independent than it is supposed to be." (citing *Schor*, 478 U.S. at 850)). And because Waldman's objection implicated both his personal rights and the structural interests advanced by Article III, the objection could not be waived. *Id.*

The Ninth Circuit reached the opposite conclusion in *In re Bellingham Insurance Agency, Inc.*, 702 F.3d at 566–70. In that case, Bellingham Insurance Agency, Inc., filed a Chapter 7 bankruptcy petition, after which the trustee filed a complaint against Executive Benefits Insurance Agency, Inc., seeking to recover allegedly fraudulent conveyances and to hold Executive Benefits liable for Bellingham's debts. The bankruptcy court granted summary judgment to the trustee, and the district court affirmed. Prior to oral argument before the Ninth Circuit, Executive Benefits argued for the first time that the bankruptcy judge was constitutionally prohibited from

entering final judgment on the trustee's claims. *Id.* at 557. The court held that Executive Benefits had waived its right to have an Article III judge decide the matter, *see id.* at 566–70, finding the waivable nature of an Article III, § 1, objection to be "well established," *id.* at 566–67 (citing *MacDonald v. Plymouth Cnty. Trust Co.*, 286 U.S. 263, 267 (1932)). Like the Sixth Circuit it relied on *Schor*: "Following the genesis of the modern bankruptcy system, the Supreme Court clarified that 'Article III, § 1's guarantee of an independent and impartial adjudication by the federal judiciary of matters within the judicial power of the United States … serves to protect primarily personal, rather than structural, interests.'" *Id.* at 567 (quoting *Schor*, 478 U.S. at 848). In a footnote, the court acknowledged that *Schor* held "that 'notions of consent and waiver cannot be dispositive' of Article III problems when 'the encroachment or aggrandizement of one branch at the expense of the other' is at stake, because in such cases structural principles are implicated in addition to private rights entitlements." *Id.* at 567 n.9 (quoting *Schor*, 478 U.S. at 850–51). But it reasoned that while aggrandizement was an issue in *Schor* (because that case involved an executive agency adjudicating a state-law counterclaim), "the allocation of authority between bankruptcy courts and district courts *does not implicate structural interests*, because bankruptcy judges are 'officer[s] of' the district court and are appointed by the Courts of Appeals." *Id.* (emphasis added) (citing 28 U.S.C. §§ 151, 152(a)(1)). Therefore, the court concluded, "'as a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver.'" *Id.* at 567 (quoting *Schor*, 478 U.S. at 848). In another footnote, the court commented that it is this principle that allows "federal

magistrate judges, acting with the consent of the litigants, to enter final judgments in proceedings that would otherwise be the exclusive province of Article III courts." *Id.* at 567 n.10 (citing 28 U.S.C. § 636(c)(1)). It also noted that consent to a magistrate's entry of final judgment "may be implied from a litigant's actions." *Id.* (citing *Roell*, 538 U.S. at 586–87). Finally, the court observed that "§ 157(c)(2) expressly provides that bankruptcy courts may enter final judgments in non-core proceedings 'with the consent of all the parties to the proceeding,'" *id.* at 567, and it concluded that "[i]f consent permits a non-Article III judge to decide finally a non-core proceeding, then it surely permits the same judge to decide a core proceeding in which he would, absent consent, be disentitled to enter final judgment," *id.*

We think the Sixth Circuit has the better view under current law. *Schor* holds that waiver or consent may be a factor in determining whether delegation of judicial business to non-Article III tribunals is unconstitutional, but it cannot be dispositive because of the structural role of Article III, § 1. And *Stern* unequivocally holds that 28 U.S.C. § 157(b) violates the structural protections of Article III, § 1, in permitting a bankruptcy judge to enter final judgment in certain "core proceedings." In other words, unlike *Schor*, where party consent was permissible because the statutory scheme at issue did not implicate structural concerns, the Supreme Court has already held that the statutory scheme granting bankruptcy judges authority to enter final judgment in core proceedings *does* implicate structural concerns where the core proceeding at issue is "'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,'" *Stern*, 131 S. Ct. at

2609 (quoting *N. Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring in judgment)). Therefore, we cannot agree with our colleagues on the Ninth Circuit that the allocation of authority between bankruptcy courts and district courts with regard to core proceedings does not implicate structural interests. We also observe that in *Stern* the Court rejected the proposition that the fact that bankruptcy judges are appointed by Article III judges makes a difference; the Court explained that since it was the bankruptcy court itself that "exercise[d] 'the essential attributes of judicial power [that] are reserved to Article III courts,' it [did] not matter who appointed the bankruptcy judge or authorized the judge to render final judgments in such proceedings. The constitutional bar remain[ed]." *Id.* at 2619 (second alteration in original) (quoting *Schor*, 478 U.S. at 851).

It is true that under 28 U.S.C. § 157(c)(2) parties may consent to final resolution of a noncore proceeding by a bankruptcy judge, but we do not think that this inexorably leads to the conclusion that parties may consent to final adjudication of a core proceeding by a bankruptcy judge or waive a *Stern* objection. For one thing, the Supreme Court has not passed on the constitutionality of § 157(c). *Cf. Stern*, 131 S. Ct. at 2615 n.8 (observing that "the notion of 'consent' does not apply in bankruptcy proceedings as it might in other contexts"); *Granfinanciera*, 492 U.S. at 59 n.14 ("Parallel reasoning [to *Schor*] is unavailable in the context of bankruptcy proceedings, because creditors lack an alternative forum to the bankruptcy court in which to pursue their claims."). In any event, the statutory scheme established by Congress for core proceedings differs in significant respects from the scheme for

noncore proceedings. Whereas Congress has vested bankruptcy judges with authority to enter final orders and judgments in core proceedings subject only to review by the district court under traditional appellate standards, *see* §§ 157(b), 158(a), in noncore proceedings Congress has vested bankruptcy judges with authority to hear the matter and submit proposed findings of fact and conclusions of law to the district court, and it is the district court that enters final judgment after de novo review, § 157(c)(1). Section 157(c)(2) permits a bankruptcy judge to enter final judgment in a noncore proceeding, but only if the parties consent and the district court decides to refer the matter to the bankruptcy court. Thus, a strong argument can be made that with respect to noncore proceedings Congress has left the essential attributes of judicial power to Article III courts, and so the structural interests at issue with regard to core proceedings are not present under the current statutory scheme applicable to noncore proceedings, thereby allowing room for notions of waiver and consent. *Cf. Peretz*, 501 U.S. at 936–37; *United States v. Raddatz*, 447 U.S. 667, 681–84 (1980) (holding that there was no Article III impediment to a magistrate judge's submission of proposed findings of fact and conclusions of law concerning suppression motion because ultimate suppression decision was made by the district judge). In this case we need not, and do not, express an opinion on the constitutionality of § 157(c)(2), or for that matter § 636(c)(1), which permits litigants to consent to entry of final judgment by a magistrate judge, *cf. Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 404–07 (5th Cir. 2012) (declining to hold that *Stern* affected a magistrate judge's authority to enter final judgment on a state-law counterclaim

under § 636(c)(1)). Our discussion is intended only to show
that, unlike the Ninth Circuit, we do not think that a party's
*Stern* objection to a bankruptcy court's entry of final judgment
in a core proceeding is waivable simply because Congress has
authorized litigants to consent to a bankruptcy judge's final
adjudication of a noncore proceeding.[2]

---

[2]   We also disagree with the Ninth Circuit that *MacDonald v. Plymouth
County Trust Co.*, 286 U.S. 263 (1932), supports the notion that the
waivability of an Article III, § 1, objection is "well established." *In re
Bellingham Ins. Agency, Inc.*, 702 F.3d at 566–67. Prior to the Bankruptcy Act
of 1978, federal district courts served as bankruptcy courts and employed
a "referee" system. *See N. Pipeline*, 458 U.S. at 53 (plurality opinion). In
*MacDonald*, the Court held that the parties could consent to have an action
to set aside voidable preferences summarily tried by a referee—i.e., the
parties could agree to waive the benefits of the procedures employed in
plenary suits tried to the district courts. 286 U.S. at 265–68. But *MacDonald*
was decided on statutory grounds—the question was whether the referee
had *statutory* jurisdiction, and the Court's holding was based on its
conclusion that the relevant statutory definitions of "courts" and "court of
bankruptcy" included the referee. *Id.* at 268. The *MacDonald* Court did not
mention the Constitution, let alone Article III, § 1. Furthermore, as the
plurality in *Northern Pipeline* observed, the particular adjunct functions
exercised by the bankruptcy referees prior to the 1978 Act were "never …
explicitly endorsed by" the Supreme Court, and the bankruptcy courts
created under the 1978 Act, which are very similar to the bankruptcy courts
in existence today, differed significantly from the old referee system. 458
U.S. at 79 n.31. We simply do not see how a decision interpreting an old
statute that differs considerably from current law can support the proposi-
tion that waiver of an Article III, § 1, objection is "well established." *See
Plaut*, 514 U.S. at 232 n.6 ("Of course the unexplained silences of our
decisions lack precedential weight." (citations omitted)); *Webster v. Fall*, 266
U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither
brought to the attention of the court nor ruled upon, are not to be consid-

(continued...)

In sum, we hold that under current law a litigant may not waive an Article III, § 1, objection to a bankruptcy court's entry of final judgment in a core proceeding. We thus turn to consider Sharif's constitutional objection to the bankruptcy court's authority, despite the fact that he waited so long to assert it.

### 2. The Bankruptcy Court Lacked Constitutional Authority

Sharif maintains that the bankruptcy judge lacked constitutional authority to enter final judgment on Count V of WIN's adversary complaint, the alter-ego claim. He concedes, however, that the bankruptcy court had authority to enter final judgment on the first four counts of the complaint, which objected to discharge of Sharif's debts under 11 U.S.C. § 727. We agree with Sharif on both points.

The first four counts of the complaint sought to prevent discharge of Sharif's debts. These claims stem from federal law, not state law, as the provisions of 11 U.S.C. § 727 provide the relevant rules of decision. Moreover, whether to grant or deny discharge is central to the restructuring of the debtor-creditor relationship. Although it is debatable whether such restructuring falls under the rubric of public rights, *see Stern*, 131 S. Ct. at 2614 n.7; *Granfinanciera*, 492 U.S. at 56 n.11; *but cf. N. Pipeline*, 458 U.S. at 71 (plurality opinion) ("[T]he restructuring of debtor-creditor relations, which is at the core of the federal

---

[2] (...continued)
ered as having been so decided as to constitute precedents." (citations omitted)).

bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages … . The former may well be a 'public right,' but the latter obviously is not."), it is clear that WIN's objections to discharge differ markedly from the state-law claims at issue in *Stern*, *Granfinanciera*, *Northern Pipeline*, and *Ortiz*. The Supreme Court has not come close to holding that an Article III judge must decide claims for which the Bankruptcy Code itself provides the rule of decision, and we will not do so here, where the parties concede that the bankruptcy judge had authority.

Our analysis of the alter-ego claim is somewhat hampered by the posture of this case. Because the bankruptcy court entered default judgment it had no need to address the merits of the alter-ego claim and thus no need to identify what WIN substantively would have been required to show to establish that the Soad Wattar Trust was Sharif's alter ego, and the parties have not filled that informational void. Our independent research of Illinois law reveals that the alter-ego theory of liability most commonly, if not exclusively, arises in the context of piercing the corporate veil, in which creditors attempt to disregard the corporate form to reach the personal assets of the shareholders. *See, e.g.*, *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569–73 (7th Cir. 1985); *Main Bank v. Baker*, 427 N.E.2d 94, 101–02 (Ill. 1981). "Piercing the corporate veil" is an equitable doctrine that depends on the circumstances in each case. *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1345 (7th Cir. 1987); *see Main Bank*, 427 N.E.2d at 102. There are two showings that must be made to establish that a corporation is merely an alter ego: "'first, there must be such

unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and second, circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Koch Refining*, 831 F.2d at 1345 (quoting *Gallagher v. Reconco Builders, Inc.*, 415 N.E.2d 560, 563–64 (Ill. App. Ct. 1980)); *see also Main Bank*, 427 N.E.2d at 101. "The degree of control one entity holds over another [(i.e., the first element)] has been measured in Illinois by evidence of misrepresentation; commingling of funds, assets, or identities; undercapitalization; failure to operate at arm's length; and failure to comply with corporate formalities." *Koch Refining*, 831 F.2d at 1345 (citing *Main Bank*, 427 N.E.2d at 102); *see also Van Dorn Co.*, 753 F.2d at 570 (listing similar factors). "Once the first element of the test is established, *either* the sanctioning of a fraud (intentional wrongdoing) *or* the promotion of injustice, will satisfy the second element." *Van Dorn Co.*, 753 F.2d at 570.

It is unclear whether Illinois recognizes an analogous alter-ego theory to disregard the separate legal identity of a trust. *Cf. In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003) ("The question whether the 'alter ego theory' of piercing applies to trusts is a matter of state law." (citation omitted)). WIN cites no cases to support such a cause of action, and the only case cited by Sharif involved a court's refusal to impose a resulting trust due to the party's inequitable conduct, *see Am. Nat'l Bank & Trust v. Vinson*, 653 N.E.2d 13, 15–16 (Ill. App. Ct. 1995). But we proceed on the assumption that such a theory exists and that it is governed by the standards for piercing the corporate veil because the parties have so assumed and the merits are not at issue in this appeal.

In almost all material respects, WIN's alter-ego claim is indistinguishable from the tortious-interference counterclaim in *Stern*, the fraudulent-conveyance claim in *Granfinanciera*, the contract claim in *Northern Pipeline*, and the disclosure claims in *Ortiz*. The alter-ego claim is a state-law claim that does not involve "public rights." The dispute is between private parties and involves no governmental parties. It stems from state law rather than a federal regulatory scheme. And it does not involve a particularized area of law. Instead, it is a common-law claim for which state law provides the rule of decision, and it is intended only to augment the bankruptcy estate. *See Stern*, 131 S. Ct. at 2611–15; *Granfinanciera*, 492 U.S. at 49–59; *N. Pipeline*, 458 U.S. at 67–76 (plurality opinion); *id.* at 91 (Rehnquist, J., concurring in judgment); *In re Ortiz*, 665 F.3d at 914. Furthermore, it is beyond dispute that the bankruptcy court was not acting as an adjunct to the district court. *See Stern*, 131 S. Ct. at 2618–19; *N. Pipeline*, 458 U.S. at 76–87 (plurality opinion); *id.* at 91 (Rehnquist, J., concurring in judgment).

WIN argues that the bankruptcy court had authority to enter judgment on the alter-ego claim because WIN had to establish that the Soad Wattar Trust was Sharif's alter ego in order to establish the grounds for denying discharge under 11 U.S.C. § 727. Though it is not clear, WIN appears to be trying to fit this case within the narrow confines of *Katchen*, 382 U.S. at 329–36, and *Langenkamp*, 498 U.S. at 44, but for several reasons we are not persuaded. First, WIN's alter-ego claim technically was asserted against a nonparty to the bankruptcy proceedings, the Soad Wattar Trust (of which Sharif was trustee). The holdings of *Katchen* and *Langenkamp* can come

into play only where the party against whom the action is asserted has filed a claim against the bankruptcy estate. *See Stern*, 131 S. Ct. at 2615–18; *In re Ortiz*, 665 F.3d at 914. Second, while the alter-ego claim may have some overlap with the objections to discharge, nothing indicates that it has any relation to the claims-allowance process. *See Stern*, 131 S. Ct. at 2618 ("Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."); *In re Ortiz*, 665 F.3d at 914. Third, the trustees' rights of recovery in *Katchen* and *Langenkamp* were creatures of federal bankruptcy law, whereas the alter-ego claim here, like the counterclaim in *Stern*, "is in no way derived from or dependent upon bankruptcy law; it is a state [claim] that exists without regard to any bankruptcy proceeding." *Stern*, 131 S. Ct. at 2618. Finally, it simply cannot be said that by resolving WIN's objections to discharge the bankruptcy court necessarily would have needed to resolve the alter-ego claim. To be sure, there is some factual overlap, particularly with respect to Count I, which alleged that Sharif had continuously concealed property in the Soad Wattar Trust with intent to deceive. But in passing on the merits of the alter-ego claim, the bankruptcy court would have had to determine, first, whether Illinois law recognizes an alter-ego theory for piercing a trust and, second, whether the evidence satisfied the applicable standard. Assuming that the standard for trust piercing is similar to that for corporate-veil piercing, that would require not only a showing of concealment of assets in the trust with intent to deceive, but also that there was a unity of ownership

(or a merger of the legal and equitable estates, in trust lingo) such that the trust and Sharif ceased to exist as separate entities. Thus, even if we could look past the facts that the Soad Wattar Trust did not file a claim and that the objections to discharge have nothing to do with the claims-allowance process, we cannot say that in resolving WIN's claims under 11 U.S.C. § 727 the bankruptcy court *necessarily* would have resolved the alter-ego claim had it reached the merits (as opposed to entering default judgment). *See Stern*, 131 S. Ct. at 2617–18; *In re Ortiz*, 665 F.3d at 914.

In sum, WIN's alter-ego claim is a state-law claim between private parties that is wholly independent of federal bankruptcy law and is not resolved in the claims-allowance process. *Accord In re Madison Bentley Assocs.*, 474 B.R. 430, 439 (S.D.N.Y. 2012). Consequently, we hold that although the bankruptcy court had constitutional authority to enter final judgment on WIN's objections to discharge, it lacked constitutional authority to enter final judgment on WIN's alter-ego claim. *Cf. Waldman*, 698 F.3d at 919–21 (holding that although bankruptcy court had constitutional authority to enter final judgment on debtor's disallowance claims against creditor, it did not have constitutional authority to enter final judgment on debtor's state-law claims).

### 3.  Remedy

So the bankruptcy court lacked constitutional authority to enter final judgment on the alter-ego claim, but what is the proper remedy? Sharif requests the relatively modest remedy of remanding to the district court and allowing him to object to the bankruptcy court's July 6, 2010, order as a report and

recommendation. The district judge could then enter final judgment "after considering the bankruptcy judge's proposed findings [of fact] and conclusions [of law] and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1). While perhaps the most practical and equitable remedy, there are serious questions as to whether it is authorized by statute.

Recall that Sharif waived his contention that the alter-ego claim is a noncore proceeding and that, as a result, we proceeded on the assumption that it is a core proceeding. In core proceedings, "§ 157(b)(1) authorizes bankruptcy courts to '*enter* appropriate orders and judgments,' not to propose them." *Waldman*, 698 F.3d at 921. No statutory provision authorizes a bankruptcy court to propose findings of fact and conclusions of law in a core proceeding; such a report and recommendation from the bankruptcy court is statutorily authorized only in noncore proceedings, *see* § 157(c)(1). So "[f]or the bankruptcy judge's orders to function as proposed findings of fact or conclusions of law …, we would have to hold that the [alter-ego claim was] 'not a core proceeding' but [is] 'otherwise related to a case under title 11.'" *In re Ortiz*, 665 F.3d at 915 (quoting § 157(c)(1)). *But see In re Bellingham Ins. Agency, Inc.*, 702 F.3d at 566 n.8 (rejecting *Ortiz* as not "thoroughly reasoned").

In *Waldman*, the Sixth Circuit did precisely that, even though (like Sharif) the party raising the *Stern* objection had waived his statutory argument that the affirmative claims were noncore. 698 F.3d at 921–22. The court reasoned that "the fortuity of Waldman's waiver of his own rights does nothing to diminish the bankruptcy court's authority under

§ 157(c)(1)." *Id.* at 922. And because the court concluded that the affirmative claims for fraud were noncore, it remanded the matter to the district court with instructions to treat the bankruptcy court's purported entry of final judgment as proposed findings and conclusions and to review them de novo under § 157(c)(1). *Id.*

We find the Sixth Circuit's approach to be reasonable, but given the total lack of argument from Sharif and WIN on whether the alter-ego claim is truly core or noncore, we will leave it to the district court to make that determination in the first instance. Because the core/noncore status of the alter-ego claim is not apparent, we explore the proper course of action should that claim turn out to be a core proceeding.

Assuming that the alter-ego claim is in fact a core matter, it is difficult to find a statutory basis on which the district court could rely to treat the bankruptcy court's order as proposed findings and conclusions. To be sure, the bankruptcy court never reached the merits of the claim because it entered default judgment as a discovery sanction. But there is no statutory provision authorizing a bankruptcy court to preside over discovery, apart from its authority over core and noncore matters. It is true that magistrate judges often preside over pretrial matters such as discovery, even if the district court ultimately decides the claims for which discovery is sought, but 28 U.S.C. § 636(b)(1)(A) expressly authorizes a district judge to "designate a magistrate judge to hear and determine any pretrial matter pending before the court," with certain exceptions and subject to reconsideration by the district judge if "the magistrate judge's order is clearly erroneous or contrary to law." No analogous statutory authorization exists for

bankruptcy judges. It appears, therefore, that if the alter-ego claim is in fact a core proceeding, the only statutorily authorized remedy would be for the district court to withdraw the reference, *see* § 157(d), and then set a new discovery schedule. Of course, this would present a windfall to Sharif, but it is difficult to see any other solution under the peculiar circumstances of this case.

Accordingly, on remand the district court shall first determine whether the alter-ego claim is a core or a noncore proceeding. If it concludes that it is a noncore proceeding, then the court may treat the bankruptcy court's order purporting to enter final judgment on the alter-ego claim as proposed findings of fact and conclusions of law to be reviewed de novo. *See* Fed. R. Bankr. P. 9033(d) ("The district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions."). If, on the other hand, the court determines the alter-ego claim to be a core proceeding, then it shall order that the reference of the alter-ego claim to the bankruptcy court be withdrawn and conduct fresh discovery proceedings in the district court, though the district judge will have discretion in setting a more abbreviated schedule given that prior discovery has been had.

### III. Appellate Jurisdiction

We must next determine what effect, if any, our holding that the bankruptcy court lacked constitutional authority to enter final judgment on the alter-ego claim has on our appellate jurisdiction over the remainder of Sharif's appeal. *See, e.g.*, *In re Ortiz*, 665 F.3d at 910; *India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 657 (7th Cir. 2010). As noted earlier, in *Ortiz* we concluded that the bankruptcy court's lack of constitutional authority to enter final judgment on the debtors' claims deprived us of appellate jurisdiction, but that was due to the unique posture of that appeal, namely, we had permitted the parties to bypass the district court and bring a direct appeal from bankruptcy court. 665 F.3d at 914–15. Here, Sharif first appealed to the district court and then brought this appeal from the district court's judgment affirming the bankruptcy court, so *Ortiz* does not control our jurisdictional inquiry.

As a general rule, we have jurisdiction over a bankruptcy appeal that has first been appealed to the district court only if *both* the bankruptcy court's original order *and* the district court's order reviewing the bankruptcy court's original order are final. *In re Rimsat, Ltd.*, 212 F.3d 1039, 1044 (7th Cir. 2000); *see* 28 U.S.C. § 158(a)(1) & (d)(1). Finality in the bankruptcy context "is considerably more flexible than in an ordinary civil appeal taken under 28 U.S.C. § 1291," *In re Gould*, 977 F.2d 1038, 1040–41 (7th Cir. 1992), as it does not require that the entire bankruptcy proceeding have been terminated, *see, e.g.*, *In re Kilgus*, 811 F.2d 1112, 1116 (7th Cir. 1987). Rather, the test for finality in this context "is whether an order resolves a discrete dispute that, but for the bankruptcy, would have been

a stand-alone suit." *Zedan v. Habash*, 529 F.3d 398, 402 (7th Cir. 2008); *In re USA Baby, Inc.*, 674 F.3d 882, 883 (7th Cir. 2012).

The bankruptcy court's order entering default judgment on WIN's adversary complaint was a final, appealable judgment, as it resolved all claims of the complaint against all parties. *See Zedan*, 529 F.3d at 402 ("We have consistently explained that the final disposition of any adversary proceeding falls within our jurisdiction."); *In re Teknek, LLC*, 512 F.3d 342, 345 (7th Cir. 2007). That the entry of default judgment was a discovery sanction makes no difference because, unlike monetary sanctions, a sanction such as default judgment or dismissal that completely eliminates the possibility of a decision on the merits is final for purposes of appeal. *See In re Golant*, 239 F.3d 931, 934–35 (7th Cir. 2001). Nor does our conclusion that the bankruptcy judge lacked authority to enter final judgment on the alter-ego claim alter finality. The only claims over which the bankruptcy judge had constitutional authority were objections to the discharge of Sharif's debts, and the denial of discharge in the adversary proceeding finally resolved those claims. *See In re Marchiando*, 13 F.3d 1111, 1113–14 (7th Cir. 1994) ("an order declaring the debt either dischargeable or not is a final, appealable order" (citing *In re Riggsby*, 745 F.2d 1153, 1154 (7th Cir. 1984))); *see also In re Weber*, 892 F.2d 534, 537 (7th Cir. 1989); *cf. Zedan*, 529 F.3d at 407 (Easterbrook, C.J., concurring) (arguing that objections to discharge are better handled as contested matters rather than adversary proceedings and requesting the appropriate committees to look into this subject, as the manner in which the objection is presented affects appellate review). There was nothing else for the bankruptcy court to do with respect to WIN's adversary complaint.

The district court's judgment affirming the bankruptcy court's judgment is also a final, appealable judgment. While it is true that a district judge's decision to remand for further proceedings in the bankruptcy court may destroy the finality of the bankruptcy court's order, *see In re Lopez*, 116 F.3d 1191, 1192 (7th Cir. 1997); *In re Riggsby*, 745 F.2d at 1155, the district judge in this case affirmed the bankruptcy court's judgment and that affirmance is a final decision, *see In re Golant*, 239 F.3d at 935; *In re Weber*, 892 F.2d at 538. That the bankruptcy court lacked constitutional authority to enter judgment on the alter-ego claim does not alter this conclusion. The district judge reviewed the alter-ego claim under traditional standards of appellate review rather than de novo, but that does not alter the fact that it entered a final judgment; it simply constitutes a defect in the final judgment, not a lack of finality. We thus have appellate jurisdiction under § 158(d) to consider the remaining balance of Sharif's appeal.

## IV. Sanctions Were Not an Abuse of Discretion

Sharif challenges the district court's affirmance of both the default judgment and the award of attorney's fees to WIN as discovery sanctions, *see* Fed. R. Civ. P. 37(b); *see also* Fed. R. Bankr. P. 7037 (rendering Fed. R. Civ. P. 37 applicable in adversary proceedings), though he focuses almost exclusively on the default judgment. A court's imposition of sanctions under Rule 37 is reviewed for an abuse of discretion, *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) (per curiam); *In re Thomas Consol. Indus., Inc.*, 456 F.3d 719, 724 (7th Cir. 2006), which requires the appealing party to demonstrate clearly "that no reasonable person would agree [with] the trial court's assessment of what sanctions are

appropriate," *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 223 (7th Cir. 1992). When reviewing a district court's affirmance of a bankruptcy court's ruling we apply the same standards as the district court, *In re Snyder*, 152 F.3d 596, 599 (7th Cir. 1998), reviewing factual findings for clear error and legal conclusions de novo, *In re UNR Indus., Inc.*, 986 F.2d 207, 208 (7th Cir. 1993).

### A.  *Default Judgment*

Sharif challenges the bankruptcy court's entry of default judgment on two fronts. First, he contends that the bankruptcy court violated his right to due process by entering default judgment without providing him notice that his discovery responses were deficient. Second, he maintains that his discovery responses were in substantial compliance with the discovery order and, therefore, that the bankruptcy court abused its discretion in imposing the severe sanction of default. Neither argument is persuasive.

The sanctions of dismissal and entry of default judgment are strong medicine, so before a court imposes such a sanction it must find by clear and convincing evidence that the party against whom the sanction is imposed displayed willfulness, bad faith, or fault. *Maynard v. Nygren*, 332 F.3d 462, 467–68 (7th Cir. 2003). Although courts are strongly encouraged to make such a finding explicitly, on appeal it may be inferred from the sanction order. *In re Golant*, 239 F.3d at 936. Another necessity flowing from the severity of the sanction is that a court must give at least the party's attorney notice and an opportunity to respond before entering a default judgment (or dismissing the case), but there need not be repeated warnings formalized in writing. *See, e.g., Ball v. City of Chicago*, 2 F.3d 752, 755 (7th Cir.

1993) ("'Due warning' need not be repeated warnings and need not be formalized in a rule to show cause. A judge is not obliged to treat lawyers like children. But there should be an explicit warning in every case."); *Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 164 (7th Cir. 1994) ("a formal, written order to comply with discovery is not required under Rule 37(b); an oral directive from the district court provides a sufficient basis … if it unequivocally directs the party to provide the requested discovery"). Moreover, despite the severity of the sanction, a court is not required to issue less severe sanctions before deciding to enter default judgment (or to dismiss the case). *See Patterson v. Coca-Cola Bottling Co.*, 852 F.2d 280, 284 (7th Cir. 1988) ("a district court is not required to fire a warning shot").

In arguing deficient notice, Sharif relies in part on the requirement that in a motion to compel disclosure or discovery the moving party "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a). We are unable to see how Rule 37(a) supports Sharif's argument. Sharif's responses to WIN's discovery requests were due on March 15, 2010, but Sharif ignored those requests. On April 13, WIN's counsel conferred with Sharif's counsel and requested complete responses to discovery requests by April 23. Sharif's counsel would not agree to WIN's request, so on April 15 WIN filed its motions to compel and for sanctions in the bankruptcy court. Accordingly, WIN satisfied its Rule 37(a) obligation to confer in good faith with Sharif prior to filing its motion to compel with the bankruptcy court.

Sharif also maintains that he was not given proper notice that his production was deficient and that WIN made no demands and identified no deficiencies between April 28 and the evidentiary hearing on May 24. On April 21, the bankruptcy court granted the motion to compel and continued the motion for sanctions. In its order, the court expressly stated that an order of default would be entered if Sharif did not comply with the discovery requests by April 28 (approximately six weeks after the original due date). *Cf. In re Thomas Consol.*, 456 F.3d at 727 (warning was sufficient where district court warned trustee's lawyer that case would "never get to a trial" if he continued failing to comply with orders). After five years of Sharif refusing to produce requested documents (including, of course, the prior litigation), on April 27 he produced approximately 1,500 pages of documents. But his response fell woefully short of the discovery that WIN had requested. As set forth earlier in this opinion, Sharif failed to produce any documents on several matters that were the focus of WIN's requests. He failed to produce documents related to the Loan Assets, documents concerning several accounts in which he had an interest, documents concerning business ventures with which he had claimed to be involved, his signed federal and state tax returns, source documents used to prepare his tax returns, and documents related to the $271,000 he allegedly owed his family. Perhaps most importantly, he failed to produce any documents concerning the formation and funding of the Soad Wattar Trust. Additionally, much of the discovery that he tendered was deficient—for example, he failed to verify and/or sign his interrogatory responses, and instead of producing bank statements and other records related to his

bank accounts he provided the names and addresses of the banks with corresponding account numbers. *Cf.* Fed. R. Civ. P. 37(a)(4) ("an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond"); *In re Thomas Consol. Indus.*, 456 F.3d at 725. During his deposition on May 13, Sharif admitted many of these deficiencies, including his failure to produce any documentation concerning the creation and funding of the Soad Wattar Trust. On May 20, Sharif tendered supplemental discovery, which did not address the deficiencies. Then on May 24, the bankruptcy court held a hearing to determine whether Sharif had complied with the court's order compelling discovery.

Sharif had notice and he had an opportunity to be heard (he failed to show up for the May 24 hearing, but he was represented by counsel and he does not claim that the court prevented him from attending). This is *not* a case where the question of compliance is a close call. We agree with both the bankruptcy court and the district court that a phone call to Sharif's counsel "would have been futile" in light of the gross deficiencies in Sharif's responses to WIN's discovery requests, not to mention the then-five-year pattern of Sharif engaging in dilatory tactics to avoid his obligations to WIN. Sharif was provided ample notice that WIN sought discovery of his and the Soad Wattar Trust's finances. He also had notice that if he failed to respond WIN would seek sanctions, including default judgment. The bankruptcy court then expressly informed Sharif (at least, Sharif's counsel, which is all that was required) that failure to comply with the discovery requests would result in default. The bankruptcy court, rather than issuing default merely on WIN's say so at the May 24 hearing, conducted its

own, independent analysis. This case is thus far afield from *Kruger v. Apfel*, 214 F.3d 784, 787–88 (7th Cir. 2000) (per curiam), relied upon by Sharif, in which we reversed a sanction of dismissal where there had been one mistake (a missed filing deadline) and the only "notice" had been a magistrate's recommendation of dismissal, which the district court had accepted without review, *id.* at 786. The fact that the bankruptcy court did not afford Sharif more bites at the apple does not mean that his due process rights to notice and opportunity to be heard were violated.

We also conclude that the bankruptcy court's implied finding of willfulness, bad faith, or fault was not clearly erroneous and that it did not abuse its discretion in imposing the severe sanction of default. Sharif does not dispute that the discovery responses tendered on April 27 were deficient—he admitted most of those insufficiencies at his deposition. Yet he appears to claim that the supplemental discovery he tendered on May 20 and the materials he submitted in his June 22 motion for summary judgment placed him in substantial compliance. We decline to consider the materials he presented after the bankruptcy court's deadline of April 28 passed. We also note that when he made the same argument before the bankruptcy court he failed to specify the documents produced after the deadline, the information contained therein, whether they were responsive to WIN's requests, and why they had not been produced sooner. His failure to develop his argument below waives it on appeal. *See, e.g.*, *Williams v. Dieball*, No. 12–3348, 2013 WL 3942932, at *3–4 (7th Cir. Aug. 1, 2013). Considering only the discovery that Sharif tendered before the April 28 deadline, there is clear and convincing evidence that

Sharif's noncompliance with the discovery order was willful and in bad faith. The evidence of bad faith becomes overwhelming once Sharif's history of dilatory and feckless tactics is taken into account. *Cf. Smith v. Smith*, 145 F.3d 335, 344 (5th Cir. 1998) ("In making its 'bad faith' determination, the district court was entitled to rely on its complete understanding of the parties' motivations. Defendants present no authority for the proposition that the district court is prevented from considering a party's actions in a related case in making its bad faith determination under Fed. R. Civ. P. 37. Moreover, the dilatory and obstructive conduct of the defendants has been well-documented and the extreme sanction of default judgment was warranted by their actions." (internal citations omitted)).

In many respects this case is similar to *Golant*, in which we upheld a bankruptcy court's entry of default judgment as a discovery sanction, where the court had repeatedly ordered Golant to comply with discovery requests and he had failed to do so; Golant had admitted failing to produce numerous documents; and Golant had produced a fair number of documents in response to the discovery requests but had failed to produce "many important documents." *In re Golant*, 239 F.3d at 936–37. Entry of default judgment, we concluded, was the only adequate sanction, reasoning that "[w]here a debtor in bankruptcy refuses to be completely forthright with information regarding his financial dealings and resources—information that is of paramount importance to an efficient and fair bankruptcy proceeding—the bankruptcy court is left with little recourse but to enter default judgment against the debtor," *id.* at 937. As in *Golant*, the bankruptcy court here did not abuse its discretion in imposing the sanction of default judgment. *See*

*also In re Kilgus*, 811 F.2d at 1118 ("Judges must be able to enforce deadlines. Doing so means the use of sanctions, even severe ones such as default, when parties ignore the ongoing proceedings and demand the right to set their own deadlines. The entry of defaults may be especially important in bankruptcy cases, which may involve hundreds or thousands of parties.").

### B.  Attorney's Fees

The district court entered two separate orders against Sharif awarding WIN attorney's fees and costs. Sharif has appealed both, but he made no argument in his opening brief as to why the fee awards are erroneous, so WIN contends that he has waived any claims concerning them. Sharif responds that reversal of the fee awards is the "natural corollary" to reversal of the sanction of default judgment.

Sharif's failure to develop an argument in his opening brief has waived any claim he may have to the propriety of awarding fees and costs in the first place. We have concluded that the bankruptcy court did not abuse its discretion in entering default judgment as a discovery sanction on the first four counts of the complaint, so the "natural corollary" is that the fee awards should be upheld unless there is an independent reason that they are improper. Even in his reply brief Sharif fails to identify an independent basis as to why the fee awards should not be upheld if the sanction of default is upheld.

Nevertheless, we agree that a remand to the bankruptcy court is necessary for a recalculation of the fee awards. The bankruptcy court premised its calculations on WIN having successfully obtained a default judgment on all five counts of

the adversary complaint. But the court had constitutional authority to enter judgment on only four of those counts. It seems eminently reasonable that the fee awards should be adjusted to reflect that fact. We therefore direct the district court to remand the fee awards to the bankruptcy court for a recalculation of each.

## V. Conclusion

In sum, the portion of the district court's judgment affirming the bankruptcy court's entry of default judgment denying discharge of Sharif's debts is AFFIRMED. The portion of the district court's judgment affirming the bankruptcy court's entry of default judgment on WIN's alter-ego claim is REVERSED, the bankruptcy court's judgment on the alter-ego claim is VACATED, and the case is REMANDED to the district court for further proceedings consistent with the instructions set forth in this opinion. Lastly, the district court's judgment affirming the bankruptcy court's two fee awards is REVERSED and REMANDED to the district court with instructions to remand the orders to the bankruptcy court for recalculation.